UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | | |
|---|---|---|---|
| HTC SWEDEN AB, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No.: | 3:07-CV-232 |
| | ) | | (VARLAN/SHIRLEY) |
| INNOVATECH PRODUCTS AND | ) | | |
| EQUIPMENT COMPANY, | ) | | |
| | ) | | |
| Defendant and Third-Party Plaintiff, | ) | | |
| | ) | | |
| v. | ) | | |
| | ) | | |
| HAKAN THYSELL, STEN JEANSSON, | ) | | |
| JOHN R. ABRAHAMSON, and HTC LLC, | ) | | |
| and HTC, INC., | ) | | |
| | ) | | |
| Third-Party Defendants. | ) | | |

## MEMORANDUM AND ORDER

This civil action is before the Court on Plaintiff's Motion to Dismiss Counterclaims I-VII and IX-X of Defendant's First Amended Answer, Affirmative Defenses, Counterclaims and Third-Party Claims [Doc. 21] and Third-Party Defendants' Motion to Dismiss Defendant Innovatech's Third-Party Complaint [Doc. 25]. Defendant has responded in opposition to each of the pending motions [Doc. 29] and plaintiff and third-party defendants have filed a reply brief [Doc. 31], making the motion ripe for determination. For the reasons set forth herein, plaintiff's motion to dismiss will be granted in part and denied in part and third-party defendants' motion to dismiss will be granted in part and denied in part.

# I.    Relevant Facts

As the Court is required to do on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court will construe the counterclaims and third-party claims in the light most favorable to the claimant, accept all well-pleaded factual allegations as true, and determine whether claimant can prove no set of facts in support of its claims that would entitle it to relief. *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 855 (6th Cir. 2003).

Plaintiff, HTC Sweden AB ("HTC Sweden" or "HTC"[1]), is a Swedish corporation that manufactures and sells various industrial floor grinding machines and other equipment. [Doc. 20.]  Third-party defendant Hakan Thysell is the founder, majority owner, and a director of HTC Sweden.  Third-party defendant Sten Jeansson is the managing director of HTC Sweden.  [*Id.*]  Third-party defendant HTC, LLC is a Tennessee limited liability company that, from its formation in May 2005 until early 2006, was owned by Thysell and John Abrahamson.  [*Id.*]  In early 2006, HTC, LLC was merged into or otherwise became associated with third-party defendant HTC, Inc., a Tennessee corporation, and became a wholly-owned subsidiary of HTC Sweden (HTC, Inc. and HTC, LLC are collectively referred to as "HTC, Inc.").  [*Id.*]  Third-party defendant John Abrahamson is an officer, director, and owner of HTC, Inc. and, since about August 2006, has been a director of HTC Sweden.  [*Id.*]  Third-party defendants Thysell, Jeansson and Abrahamson authorized, ordered, and controlled the acts of HTC Sweden and HTC, Inc. discussed below.  [*Id.*]

---

[1]"HTC" is also used to refer to HTC Sweden, HTC, LLC, and HTC, Inc. collectively.

Defendant and third-party plaintiff, Innovatech Products and Equipment Company ("Innovatech"), is a Washington manufacturing company founded by Roger Wiggins and owned by Mr. Wiggins and his wife Kristine. [Doc. 20.] Innovatech holds U.S. Patent No. 5,641,206 describing and claiming an industrial ride-on flooring removal machine. [*Id.*] Innovatech has designed various models of floor removal machines based upon its patented technology under the trademark Terminator. [*Id.*]

Roger Wiggins invented a multi-head grinder attachment for the Terminator machines. [*Id.*] One embodiment of this invention is a walk-behind industrial floor grinder with multiple counter-rotating grinding heads. [*Id.*] In early 1998, Innovatech manufactured three-head and four-head versions of the Terminator grinder attachment. [*Id.*] Industrial floor grinders, such as the ones manufactured by Innovatech, are used to abrade or polish the surface of natural stone, composition, or concrete floors. [*Id.*] They use diamond tooling segments in various grits and configurations to do the abrading and polishing. [*Id.*] These diamond tooling segments wear down and must be replaced from time to time. [*Id.*]

In January 1999, Roger Wiggins attended "The World of Concrete" trade show on behalf of Innovatech. [*Id.*] At the show, Wiggins met Thysell. [*Id.*] Thysell suggested to Wiggins that, instead of developing its own grinders, Innovatech should become a dealer of HTC's industrial floor grinders. [*Id.*] Wiggins agreed that Innovatech would become a distributor of HTC's industrial floor grinders. [*Id.*]

From approximately 1999 until 2004, Innovatech purchased HTC's line of industrial floor grinders, diamond tooling, necessary repair and maintenance parts for HTC grinders,

and various grinding machine accessories for resale in the United States. [*Id.*] Industrial floor grinders create a large amount of very fine stone or concrete dust when they are used, and, therefore, a high-quality industrial vacuum is needed to clean up the mess generated by a grinder. [*Id.*] Accordingly, Innovatech also purchased industrial vacuum systems for resale to its customers that were designed to work with HTC's grinders from Ermator AB ("Ermator"). [*Id.*]

In late 2003, Roger Wiggins heard rumors from other HTC distributors that Thysell was planning to terminate Innovatech as a distributor of HTC products. [*Id.*] Thysell assured Wiggins that this was not the case. [*Id.*] Relying on this information from Thysell, Innovatech continued to market and sell HTC grinders, and diamond tooling and accessories and Ermator industrial vacuums. [*Id.*]

Around this time, HTC sent Innovatech a "Loyalty Agreement." [*Id.*; Doc. 20-5.] HTC insisted that Wiggins sign the agreement and when he did not, HTC refused to ship products to Innovatech. [Doc. 20.] Some of the products that HTC refused to ship were back-ordered items that Innovatech had already sold to its customers. [*Id.*] Wiggins suggested a compromise loyalty agreement, but Thysell and Jeannsson refused to sign it. [*Id.*; Doc. 20-6.] At some point, HTC resumed its normal practice of shipping its products to Innovatech. [Doc. 20.]

In 2003, VIC International was the only other U.S. distributor of HTC industrial floor grinders. [*Id.*] For 2003, VIC International was HTC's top-selling distributor anywhere in the world and Innovatech was HTC's second-highest selling distributor. [*Id.*] Innovatech

4

learned that HTC was also pressuring Vic Green, owner of VIC International, to sign the "Loyalty Agreement." [*Id.*]

Though Innovatech was not aware of it at the time, in late 2003, Hakan Thysell and HTC Sweden decided to form a subsidiary of HTC that would be owned by Thysell and would serve as the exclusive distributor of HTC products in the United States, thus precluding Innovatech's and VIC International's distribution of HTC products. [*Id.*] In March 2004, Thysell informed Roger Wiggins that he was cutting off Innovatech as a distributer, effective immediately. [*Id.*] Thysell agreed to allow Innovatech to continue to sell HTC products for the next three months and promised to continue to supply Innovatech with repair parts and maintenance items need to repair and maintain HTC's grinders for Innovatech's customers who already owned HTC grinders. [*Id.*] However, on or about April 20, 2004, Thysell stopped all shipments of HTC products to Innovatech, including spare and replacement parts needed for repair and maintenance. [*Id.*] In about May 2004, HTC also terminated VIC International as a distributor of HTC products in the United States. [*Id.*]

In May 2004, Innovatech sought to identify a replacement for HTC's grinder to continue servicing its customers in the industrial floor grinding and polishing industry. [*Id.*] Innovatech considered several manufacturers before ultimately selecting the Orbiter line of industrial grinders manufactured by Contec Maschinenbau & Entwicklungstechnik, GmbH ("Contec"), a German company. [*Id.*] Innovatech negotiated an agreement and placed orders with Contec, and began advertising the Orbiter grinders on its website and in various trade publications. [*Id.*]

5

On about May 25, 2004, Thysell and John Abrahamson formed and registered HTC, LLC as a Tennessee limited liability company. [*Id.*] John Abrahamson had formerly been the Sales Manager for Surface Preparation Equipment at VIC International. [*Id.*] In early 2006, HTC, LLC merged into or otherwise became associated with HTC, Inc. and became a wholly-owned subsidiary of HTC Sweden. [*Id.*] HTC established itself as the exclusive North American distributor of HTC's industrial floor grinders, diamond tooling, repair and replacement parts for HTC grinders and the only authorized source in North America for warranty repairs of HTC's products. [*Id.*] HTC's exclusive distribution forced Innovatech's customers to go to HTC, LLC for any needed repairs, parts, maintenance, or service of their HTC floor grinders. [*Id.*] Additionally, Innovatech was forced to either default on its warranty obligations to its customers or refer its customers to HTC, LLC. [*Id.*]

By about June 2004, HTC had attained a dominant share of the market for industrial floor grinders in the United States and Europe. [*Id.*] In fact, HTC had become the largest manufacturer, by sales, of industrial floor grinding machines in the world. [*Id.*] HTC used this dominance to keep various suppliers of surface preparation equipment, including Contec, Ermator, and Pullman AB ("Pullman") from selling products to Innovatech, or to restrict the models and product lines they sold to Innovatech. [*Id.*]

In or about September 2004, Thysell and HTC threatened Contec with litigation, claiming that the Orbiter grinders infringed one or more of HTC's patents. [*Id.*] Johannes Greb, managing director of Contec, consulted an attorney who advised that the Orbiter did not infringe any HTC patent but that, despite the likelihood that Contec would prevail at trial,

6

such litigation would take years and be very expensive. [*Id.*] Thysell offered Greb a settlement with the condition that Contec stop selling its grinders to anyone in the United States. [*Id.*] At the time, Innovatech was the only distributor of Orbiter grinders in the United States. [*Id.*] Because Contec was a small company that could not afford expensive litigation, Greb accepted HTC's settlement offer. [*Id.*] Contec then informed Innovatech that it could no longer sell Orbiter grinder to Innovatech for resale in the United States. [*Id.*]

Innovatech decided to develop and manufacture its own line of industrial floor grinders. [*Id.*] Accordingly, Innovatech developed a four-head floor grinder design and submitted a patent application for the design to the U.S. Patent Office on December 27, 2004. [*Id.*] There are substantial differences between Innovatech design and the HTC four-head design, as embodied in HTC's '957 patent. [*Id.*] In early 2005, Innovatech began to produce and sell its line of grinders under the Predator trademark. [*Id.*] Innovatech produced two four-head grinders, the P-3200 with a 32-inch diameter grinder and the P-2400 with a 24-inch diameter grinder, a three-head grinder, the P-1800 with an 18-inch diameter, and a single-head edge grinder. [*Id.*]

Around the same time it began to sell its Predator grinders, Innovatech placed new orders with Ermator AB for industrial vacuum systems for Innovatech to resell with its Predator grinders. [*Id.*] In early 2005, HTC threatened to pull all of its business from Ermator AB if Ermator AB continued to sell vacuum systems to Innovatech. [*Id.*] At the time, HTC accounted for more that fifty percent of Ermator AB's annual sales. [*Id.*] Under this pressure, Ermator agreed not to sell to Innovatech, though Ermator continued to supply

7

previously ordered vacuum systems to Innovatech. [*Id.*] In January 2006, Pullman AB bought Ermator AB. [*Id.*] HTC advised Pullman AB that it had a written agreement with Ermator AB not to sell vacuums to Innovatech. [*Id.*] Initially Pullman AB continued to ship the previously ordered vacuums, but after increasing threats of litigation from HTC that could destroy Pullman's business, Pullman notified Innovatech that it would no longer sell to Innovatech and that it was cancelling any further shipments on previously ordered products. [*Id.*] With the cancellation of shipments to Innovatech, HTC became the only distributor of Pullman industrial vacuum systems in the United States. [*Id.*]

## II.    Standard of Review

In order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must contain allegations supporting all material elements of the claims. *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008). In determining whether to grant a motion to dismiss, all well-pleaded allegations must be taken as true and be construed most favorably toward the non-movant. *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 855 (6th Cir. 2003). While a court may not grant a Rule 12(b)(6) motion based on disbelief of a complaint's factual allegations, *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990), the court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). The Sixth Circuit has made it clear that despite the liberal system of notice pleading, "the essential elements of a plaintiff's claim must be alleged in more than vague and conclusory terms" if such a claim is to survive a Rule 12(b)(6) motion. *NicSand, Inc. v. 3M Co.*, 457 F.3d 534, 541 (6th Cir. 2006) (internal

8

citations removed). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007) (internal quotations and citations omitted). The issue is not whether the claimant will prevail, but whether claimant is entitled to offer evidence to support its claim. *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995).

## III. Analysis

### A. Counterclaim I: Breach of Contract

To state a claim for breach of contract, a party must allege: "(1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breach of contract." *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). Innovatech alleges sufficient facts on each of these elements to survive a 12(b)(6) motion to dismiss.

Both parties agree that there was a contract. HTC argues for dismissal on the basis that because the contract did not have a termination provision, it was terminable at will and, therefore, any failure to perform on the contract was not a breach. Innovatech alleges that the breach occurred when HTC "unilaterally, without reasonable justification, and without prior notice, terminat[ed] the contract;" "unilaterally and without reasonable justification withh[eld] shipments of products that had been ordered by Innovatech in the normal course of business;" and "unilaterally and without reasonable justification attempt[ed] to impose

upon Innovatech a unilateral modification of the contract in the form of HTC's 'Loyalty Agreement.'" [Doc. 10 ¶¶ 273-75.]

A contract that is silent as to termination is terminable at will by either of the parties; however, termination at will still requires the terminating party to give reasonable notice. *Misco, Inc. v. U.S. Steel Corp.*, 784 F.2d 198, 203 (6th Cir. 1986) (citations omitted). Therefore, Innovatech's allegation that HTC terminated the contract without reasonable notice, if true, is enough to establish nonperformance that resulted in a breach of contract.

HTC also argues that Innovatech did not meet its burden of demonstrating damages caused by the alleged breach of contract. To survive a motion to dismiss, the non-moving party need only to allege sufficient facts to support each element of the claim and does not need to prove those facts. *See Ellipsis, Inc. v. Colorworks, Inc.*, 329 F. Supp. 2d 962, 969 (W.D. Tenn. 2004) (citing *Baxter v. Rose*, 305 F.3d 486, 490 (6th Cir. 2002)) ("It is not necessary at [the motion to dismiss] stage for [the claimant] to plead all facts necessary to prove each element of its claim. Instead, plaintiff must simply give 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"). Innovatech alleges that it was damaged by the breach of contract. [Doc. 10 ¶ 276.] Taking Innovatech's allegations as true for the purposes of a motion to dismiss, the Court concludes on the present record that these facts are sufficient to state a claim and HTC's motion to dismiss Innovatech's breach of contract claim will be denied.

## B.     Counterclaims II-V: Interference with Contract

Innovatech alleges that HTC interfered with its contracts with Contec (Counterclaim II), Ermator (Counterclaim III), Pullman (Counterclaim IV) and Innovatech's existing customers (Counterclaim V). To state a claim for interference with contract, a party must allege (1) a legal contract, (2) the wrongdoer was aware of the contract, (3) the wrongdoer maliciously intended to induce a breach, (4) a breach of the contract occurred as a proximate cause of the wrongdoer's actions, and (5) the breach resulted in damages. *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*, 876 S.W.2d 818, 822 (Tenn. 1994) (citation omitted). Innovatech alleges sufficient facts on each of these elements to survive a 12(b)(6) motion to dismiss.

HTC argues that Innovatech failed to allege a breach of contract occurred as a result of HTC's alleged interference. In regard to Contec, Innovatech alleges that it had a valid contract to buy floor grinders from Contec and that HTC improperly forced Contec to stop selling the grinders to Innovatech. [Doc. 10 ¶¶ 278, 280.] In regard to Ermator and Pullman, Innovatech alleges that it had a valid contract to buy industrial vacuum systems from Ermator and Pullman and that HTC improperly forced Ermator and Pullman to stop selling their vacuum systems to Innovatech. [Doc. 10 ¶¶ 288, 290, 297, 300.] In regard to Innovatech's customers, Innovatech alleges that it entered into hundreds of valid contracts with its customers to sell those customers products and repair and warranty services and that HTC improperly refused to supply Innovatech with those products and the repair and replacement parts Innovatech needed to provide repair and warranty services to its customers and, further,

11

improperly forced Innovatech's customers to go to HTC to obtain repair, maintenance, or warranty service. [Doc. 10 ¶¶ 306, 309-10.] The Court finds that these allegations are sufficient allegations of breach of contract to meet this element of interference with a contract in order to withstand a motion to dismiss.

HTC also argues that Innovatech failed to allege that HTC acted maliciously. The malice element is met by an allegation of "intentional doing of a wrongful act without just cause or excuse, with an intent to inflict injury or under circumstances that the law will imply an evil intent." *B & L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 218-19 (Tenn. Ct. App. 2004) (citing Black's Law Dictionary 862 (5th ed. 1979)). Innovatech alleges that HTC's interference with Innovatech's contracts was intentional and with knowledge and was done for improper purposes including causing Innovatech harm and limiting and restraining competition. [Doc. 20 ¶¶ 282-83, 292-93, 301-02, 308-09, 311.] Accordingly, Innovatech sufficiently alleges the malice element.

Innovatech alleges each of the elements for tortious interference with contract in regards to its contract with Contec, Ermator, and Pullman, and Innovatech's existing customers. Therefore, Counterclaims II-V will not be dismissed.

## C.     Counterclaim VI: Interference with Economic Expectation

To state a claim upon which relief can be granted for interference with economic expectation, a party must allege:

(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with

12

others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means . . . ; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (internal citations and footnote omitted). Innovatech alleges sufficient facts on each of these elements to survive a 12(b)(6) motion to dismiss.

Innovatech alleges that it had an existing business relationship with Contec, Ermator, and Pullman, and its customers who had previously purchased HTC or Contec Orbiter industrial floor grinders, or Ermator or Pullman vacuum systems from Innovatech. Innovatech alleges that HTC expressly told Ermator, Pullman, and Contec not to sell to Innovatech any longer, thus demonstrating knowledge of Innovatech's business relationship with those companies. HTC acknowledged that Innovatech was the second largest seller of HTC products in the United States for 2003, thus recognizing Innovatech's business relationship with Innovatech's customers who purchased HTC products. Innovatech also alleges that HTC's express instructions to Ermator, Pullman, and Contec were intended to terminate Innovatech's existing business relationship with those companies and that HTC's refusal to continue to ship its products to Innovatech was intended to terminate Innovatech's business relationship with its customers because HTC knew that Innovatech purchased its products for resale.

HTC does not contest any of these allegations but instead argues that this claim must be dismissed because Innovatech fails to allege improper motive because HTC was merely engaging in competitive practices. Competitors usually enjoy a privilege to draw business

13

from others. *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 183-84 (Tenn. Ct. App. 2007). "[I]n order to show that defendant had an improper motive, the plaintiff must prove that defendant's predominant purpose was to injure plaintiff." *Id.* at 183 (citing *Trau-Med*, 71 S.W.3d. at 701) (internal quotations omitted). Even if a claimant cannot show improper motive, it can succeed on a claim for interference with economic expectation by showing improper means regardless of motive. *Watson's Carpet & Floor Coverings, Inc.*, 247 S.W.3d at 184.

Even if HTC's predominate purpose in instructing Contec, Ermator, and Pullman not to do business with Innovatech was not to harm Innovatech, Innovatech sufficiently alleges that HTC's means of getting Contec, Ermator, and Pullman to agree not to sell to Innovatech were improper. Threatening to file a lawsuit in order to induce someone to cease business relations with another is improper. *See Trau-Med*, 71 S.W.3d at 701-02. In *Trau-Med*, the Tennessee Supreme Court found improper means when the defendant induced third-parties not to refer business and to discontinue use of plaintiff's clinic by threatening to prolong litigation. *Id.*

Innovatech alleges that HTC made threats to discontinue its business relationship with Contec, Ermator, and Pullman and to institute time-consuming and costly litigation against Contec, Ermator, and Pullman if they did not stop selling to Innovatech. HTC argues that its threats of litigation were not improper because there is a presumption that actions taken to enforce a valid patent are in good faith. *See Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1577 (Fed. Cir. 1990). This argument fails for two reasons. First, Innovatech

14

alleges that the patent is invalid and threats of litigation to enforce an invalid patent are improper. Second, even if HTC's patent is valid and litigation to enforce it would be valid, using the threat of litigation to extort certain behavior is improper. *See Trau-Med*, 71 S.W.3d at 701-02. Accordingly, Innovatech sufficiently alleges improper means in regard to HTC's interference with Innovatech's business relationship with Contec, Ermator, and Pullman.

Turning to Innovatech's allegation of interference with HTC's business relationship with its customers, as stated above, Innovatech alleges that HTC breached its contract with Innovatech by failing to give reasonable notice that it would no longer be selling its products to Innovatech. In fact, Wiggins directly asked Thysell whether HTC intended to cut Innovatech off as a distributor and, when Thysell responded that it did not, Innovatech continued selling HTC products and warranties to customers. Assuming these facts are true, it was through this breach of contract and misleading information that HTC interfered with Innovatech's business relationship with its customers. Breaching a contract and providing misleading information are improper means even if there was no improper motive. *See Watson's Carpet & Floor Coverings, Inc.*, 247 S.W.3d at 184. Accordingly, this element is met in regard to Innovatech's business relationship with Contec, Ermator, and Pullman, and with its existing customers.

HTC additionally argues that Innovatech failed to sufficiently allege damages. To survive a motion to dismiss, the non-moving party need only to allege sufficient facts to support each element of the claim and does not need to prove those facts. *See Ellipsis, Inc. v. Colorworks, Inc.*, 329 F. Supp. 2d 962, 969 (W.D. Tenn. 2004). Innovatech alleges that

15

HTC destroyed its expectation of continuing economic benefit from its existing business relationship with Contec, Ermator, and Pullman, and its customers and that it was damaged by this conduct in an amount that will be established at trial. [Doc. 20 ¶ 323-25, 328.] This allegation of damages is sufficient to survive a motion to dismiss. Accordingly, Innovatech's counterclaim for interference with economic expectation will not be dismissed.

### D. Counterclaim VII: Good Faith and Fair Dealing

Innovatech consents to the dismissal of this claim without prejudice of its right to assert breach of the duty of good faith and fair dealing in support of its breach of contract claim. Therefore, Counterclaim VII will be dismissed.

### E. Counterclaim IX: Restraint of Trade

Innovatech alleges that HTC unreasonably restrained trade in violation of the Sherman Act, 15 U.S.C. §§ 1-3, the Wilson Tariff Act, 15 U.S.C. § 8, and the Clayton Act, 15 U.S.C. § 14, in that HTC prohibited Contec from selling HTC's patented grinding machines to Innovatech. HTC argues for the dismissal of this claim on the basis that Innovatech does not allege an unreasonable restraint of trade as is required for a violation of the Sherman Act, 15 U.S.C. §§ 1 and 3, and Innovatech does not have standing to pursue an antitrust claim.[2]

---

[2] In a footnote, HTC also asserts that Innovatech generally failed to allege claims under the the Wilson Tariff Act, 15 U.S.C. § 8, and the Clayton Act, 15 U.S.C. § 14. The Court only addresses HTC's specific arguments for dismissal.

16

### 1.    Antitrust Standing

Standing for an antitrust claim brought by a private claimant is analyzed differently than traditional Article III standing. *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007). To have standing, "[a]n antitrust claimant must show more than merely an 'injury causally linked' to a competitive practice; it 'must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'" *NicSand*, 507 F.3d at 450 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Antitrust laws are intended to preserve competition and therefore, for there to be an antitrust injury, the claimant must be harmed by the anti-competitive aspect of the action. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142, 1152 (6th Cir. 1975) (citations omitted). The claimant must allege facts that suggest that a antitrust injury occurred; mere allegations are not sufficient. *NicSand, Inc.*, 507 F.3d at 451.

The Supreme Court has directed that standing in antitrust cases should be analyzed on a case-by-base basis by considering the following factors:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

17

*Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983) (summarizing the factors articulated in *Associated Gen. Contractors of Cal., Inc., v. Cal. State Council of Carpenters*, 459 U.S. 519, 536-46 (1983)).

As discussed in more detail below, Innovatech alleges that it was injured because HTC conditioned a patent license to Contec on Contec's agreement to stop selling its Orbiter grinders in the United States and threatened costly litigation if Contec did not agree to HTC's terms. Because Innovatech alleges it was harmed by its inability to purchase Contec's products, it alleges that its injury was caused by the anti-competitive nature of HTC's actions. Though Innovatech was a competitor of HTC, it was also a consumer of Contec's products. Because it alleges it was harmed by Contec's refusal to sell to Innovatech, it alleges that it was harmed in its role as a consumer. Innovatech alleges that Contec's refusal to sell the grinders to Innovatech was directly caused by HTC's actions.

Additionally, Innovatech alleges that at the time HTC contracted with Contec, HTC knew that Innovatech was the only seller of Contec's Orbiter grinders in the United States and HTC's purpose in causing Contec not to sell grinders in the United States was to monopolize trade or commerce in the United States in industrial floor grinders and related parts and repair services. Innovatech alleges that HTC's intent was to cause an antitrust injury. Thus, through consideration of the appropriate factors, the Court determines that Innovatech alleges sufficient facts to demonstrate antitrust standing.

## 2. **Unreasonable Restraint of Trade**

To survive a motion to dismiss an antitrust claim under the Sherman Act § 1 and § 3, a party must allege: "(1) a contract, combination, or conspiracy; (2) affecting interstate commerce; (3) which imposes an 'unreasonable' restraint on trade." *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 504 (6th Cir. 1983) (citations omitted); *see also* Sherman Act, 15 U.S.C. §§ 1, 3. Because every commercial transaction restrains trade, a party must show *unreasonable* restraint of trade to show an antitrust violation. *Northwest Wholesale Stationers v. Pacific Stationary & Printing Co.*, 472 U.S. 284, 289 (1985). HTC argues that Innovatech fails to sufficiently allege unreasonable restraint of trade. Thus, the Court will focus its discussion on that element.

Proper enforcement or licensing of a patent is not an unreasonable restraint of trade. A holder of a patent has the exclusive right to produce, use, and sell its patented invention and may exclude others from doing the same. 35 U.S.C. § 154(a)(1). Accordingly, a patentee enjoys a legal monopoly in regard to its patented invention. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 135 (1969); *Lear, Inc. v. Adkins*, 395 U.S. 653, 663 (1969). If a patentee so chooses, it may assign or license exclusive or non-exclusive rights in the patent to another. *Zenith Radio*, 395 U.S. at 136. However, the patentee "may not condition the right to use his patent on the licensee's agreement to purchase, use, or sell, or not to purchase, use, or sell, another article of commerce not within the scope of the patent monopoly." *Id.*

19

Innovatech states that HTC forced Contec to stop selling its Orbiter grinders in the United States by threatening in bad faith to institute a patent infringement suit against Contec. [Doc. 29, p. 16.] Innovatech alleges that, despite Contec's patent counsel's assurance to Contec that it was not infringing on HTC's intellectual property, Contec was forced to accept HTC's proposed settlement because it could not afford the cost of litigation. [*Id.*]

The written licence agreement which resulted between HTC and Contec licenses Contec to "produce, market and sell products according to the technique [sic] that are described within patent 0700327 and 5637032" subject to the condition that Contec "agrees not to sell grinding machines in the USA that are mechanical [sic] designed as [HTC's] patent with patent number 0700327 and 5637032."[3] [Doc. 20-9.] Although, by the express terms of the written agreement, HTC only contracted with Contec to limit the sale of HTC's patented grinding machines, Innovatech alleges that there was an agreement between HTC and Contec that restricted Contec from activities outside the scope of HTC's patents. [*See* Doc. 29, p. 18.] Accordingly, Innovatech alleges sufficient facts to support its claim of unreasonable restraint on trade because it alleges that HTC conditioned Contec's right to use

---

[3]"It is as important to the public that competition should not be repressed by worthless patents, as that the patentee of a really valuable invention should be protected in his monopoly." *Lear, Inc.*, 395 U.S. at 663-64 (citation omitted). However, patents are presumptively valid and the burden of proof to overcome this presumption is on the party attacking its validity. *See Tillotson Mfg. Co. v. Textron, Inc.*, 337 F.2d 833, 841 (6th Cir. 1964) (citing 35 U.S.C. § 282). While Innovatech states that Contec's legal counsel advised Contec that HTC's patents were unenforceable, Innovatech itself does not challenge the patents or provide facts to support a claim that the patents were unenforceable. Accordingly, the Court will treat HTC's patents numbered 0700327 and 5637032 as valid for the purposes of this discussion.

its patent on Contec's agreement not to sell Contec grinders in the United States despite this restriction going beyond the scope of HTC's patent.

Accordingly, Innovatech sufficiently alleges an unreasonable restraint of trade based upon HTC's agreement with Contec, and Counterclaim IX will not be dismissed.

### F.     Counterclaim X: RICO

A claim for a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") requires conduct of an enterprise through a pattern of racketeering activity.  18 U.S.C. § 1962(c); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985).  A pattern of racketeering activity requires at least two predicate offenses within 10 years that are indictable under a number of federal statutes.  18 U.S.C. § 1961(5).  Accordingly, the claim must also allege the elements of the predicate offenses.  *Kenty v. Bank One*, 92 F.3d 384, 389 (6th Cir. 1996).

The only predicate offense that Innovatech continues to allege is a violation of the Hobbs Act, 18 U.S.C. § 1951(a).[4]  *See* 18 U.S.C. § 1961(1) (listing predicate offenses).  A violation of the Hobbs Act can be established by showing that a defendant induced or attempted to induce the victim to part with property, including intangible property, by extortion or robbery and that interstate commerce was delayed, interrupted, or adversely effected.  *See* 18 U.S.C. § 1951(a).  In context of the Hobbs Act, "[t]he term 'extortion'

---

[4] Innovatech originally alleged wire fraud in violation of 18 U.S.C. § 1343 as a predicate offense but it agrees in its response to no longer rely upon wire fraud.  Innovatech also alleges extortion in violation of 18 U.S.C. § 875(d) in Counterclaim X.  However, as noted by HTC, 18 U.S.C. § 875(d) is not a predicate offense under the RICO statute.  *See* 18 U.S.C. § 1961(1).

means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

Innovatech alleges that HTC conspired to obstruct, delay, or affect interstate and foreign commerce through extortion but HTC argues that Innovatech failed to allege that HTC obtained property through this means. [Doc. 22.] In its reply, HTC states that any of the alleged threats it made to Innovatech's suppliers were not wrongful. [See Doc. 31.] Additionally, HTC further argues that Innovatech has not sufficiently alleged that it was harmed by extortion because Innovatech does not allege that it feared any economic loss but rather that Innovatech's suppliers feared economic loss. [*Id.*]

Innovatech claims extortion in violation of the Hobbs Act on the basis that HTC threatened to pull its business from Contec, Ermantor, and Pullman if these suppliers did not agree to refrain from selling their products to Innovatech and, as a result, Contec, Ermantor, and Pullman stopped selling to Innovatech. [Doc. 20 ¶¶ 360-62; *see also id.* ¶¶ 217; 237; 243.] However, a threat to terminate a contract is not extortion if the threatening party has a right to terminate the contract at any time. *See Westways World Travel, Inc. v. AMR Corp.*, 2008 WL 205296 (9th Cir. Jan. 22, 2008). Innovatech does not allege that HTC did not have a right to terminate its business with Contec, Ermantor, and Pullman at any time. As long as HTC had a right to terminate its business or any contracts with these suppliers at will, any threats to do so were not wrongful.

Innovatech also bases its allegation of extortion on a claim that HTC threatened Innovatech's suppliers with malicious and expensive litigation if the suppliers did not stop selling to Innovatech. Threats of litigation, even meritless litigation, do not constitute extortion under the Hobbs Act. *See Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994); *Crane Constr. v. Wal-mart Stores, Inc.*, No. 94-2803, 1996 WL 495550, at *4 (W.D. Tenn. 1996). Innovatech cites *Hall American Center Associates Ltd. Partnership v. Dick*, 726 F.Supp 1083, 1096 (E.D. Mich. 1989), in support of its argument that a threat of litigation may constitute extortion in some situations. The *Hall* court recognized several cases which determined that a threat of litigation is not a predicate act, but declined to follow any of them stating that it did not find them controlling. Notably, *Hall* predated *Vemco*. This Court is now guided by the controlling Sixth Circuit law that threats of litigation do not constitute predicate acts as articulated in *Vemco*. Accordingly, Innovatech fails to allege any predicate acts necessary for a violation of RICO, and Counterclaim X will be dismissed.

## G.      Third-Party Claim I: Restraint of Trade

Innovatech alleges that Thysell, Jeannson, Abrahamson, HTC Sweden, and HTC, Inc. (collectively "third-party defendants") conspired, agreed, and combined together to restrain trade in violation of the Sherman Act, 15 U.S.C. §§ 1-3, the Wilson Tariff Act, 15 U.S.C. § 8, and the Clayton Act, 15 U.S.C. § 14.

### 1.      Sherman Act § 1 and § 3 and Wilson Tariff Act

To survive a motion to dismiss for an antitrust claim under the Sherman Act § 1 and § 3, a party must allege: "(1) a contract, combination, or conspiracy; (2) affecting interstate

commerce; (3) which imposes an 'unreasonable' restraint on trade." *White & White, Inc. v.*

*Am. Hosp. Supply Corp.*, 723 F.2d 495, 504 (6th Cir. 1983) (citations omitted); *see also*

Sherman Act, 15 U.S.C. §§ 1; 3. A claim under the Wilson Tariff act requires a showing of

(1) a combination, conspiracy, trust, agreement, or contract; (2) one of the parties is engaged

in importation from a foreign country into the United States; and (3) an intent to restrain

trade, limit free competition, or increase the market price for the imported item. 15 U.S.C.

§ 8.

Thysell, Jeannson, Abrahamson, HTC Sweden, and HTC, Inc. argue for dismissal on

the basis that the first element cannot be met because all of the third-party defendants were

either a wholly owned subsidiary of HTC Sweden or officers and employees of HTC. A

corporate parent cannot conspire with its wholly owned subsidiary or individual employees

to violate an antitrust law. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752,

769, 771 (1984); *United States v. Ames Sintering Co.*, 1990 WL 155615, at *4 (6th Cir. 1990)

(citing *Nelson Radio & Supply v. Motorola*, 200 F.2d 911 (5th Cir. 1952) ("In accordance

with federal antitrust law, a corporation cannot conspire with its officers or employees.").

Though HTC, Inc. is now a wholly owned subsidiary of HTC Sweden, it did not become

wholly owned until 2006. [Doc. 20.] Almost all of the factual allegations in the complaint

occurred before 2006. [*Id.*] Additionally, though Thysell and Jeannson were employees of

HTC Sweden, and Thysell and Abrahamson were owners of HTC, Inc. prior to 2006, they

can be held responsible for their direct involvement in commanding the activities of their

respective companies if their companies were involved in a conspiracy. *See Brown v. Donco*

24

*Enters., Inc.*, 783 F.2d 644, 646 (6th Cir. 1986) ("Individual liability under the antitrust laws can be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends."). Accordingly, the current affiliation between the two companies and the fact that Thysell, Jeannson, and Abrahamson are employees or owners of one or both of them does not shield them from a claim of conspiring, contracting, or combining.

Third-party defendants also argue that Innovatech does not allege any actions by third-party defendants that constitute an unreasonable restraint on trade. Third-party defendants argue that there was no restraint on trade because Innovatech could purchase industrial grinders from other manufactures. This argument fails because Innovatech alleges that HTC restricted the sales of other manufactures as well. [Doc. 20.] Additionally, third-party defendants argue that any restraint was not unreasonable because they were enforcing a valid patent. The Court relies on its previous discussion of this issue in Part III.E.2 of this opinion. Accordingly, the Court finds that Innovatech sufficiently alleges violations of Sherman Act §§ 1 and 3 and the Wilson Tariff Act to withstand a motion to dismiss.

### 2. Sherman Act § 2

To allege a violation of § 2 of the Sherman Act, a party must allege "(1) the possession of monopoly power in the relevant market; and (2) the willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means as opposed to 'growth or development resulting from a superior product, business acumen, or historic accident.'" *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 932 (6th Cir. 2005)

25

(quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595-96 (1985)). Third-party defendants argue that Innovatech failed to allege facts to support a claim under § 2 of the Sherman Act because it does not allege market power or any maintenance of that power.

Monopoly power is "the power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (citation omitted). One way of meeting this element is to show that a defendant has the market power to force a competitor out of the market. *See Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 487 (D.C. Cir. 1996). The pleading party can do so by showing the defendant had a predominant share of the market. *See Grinnell Corp.*, 384 U.S. at 571. Innovatech alleges that "HTC had become the largest manufacturer (by sales) of industrial floor grinding machines in the world. HTC had attained and continues to hold a dominant market share position in the United States and Europe." [Doc. 20.] While Innovatech admits that there are other manufacturers of industrial grinders from which it could have purchased grinders and vacuum systems, it alleges that HTC forced other manufacturers from which Innovatech attempted to buy grinders and vacuums to stop selling to Innovatech. [*Id.*] The Court finds that Innovatech sufficiently alleges monopoly power to support its claim for a violation of § 2 of the Sherman Act.

Additionally, Innovatech alleges that third-party defendants willfully acquired, maintained, or used monopoly power by anti-competitive means. Innovatech alleges that third-party defendants used the economic power of HTC and threats and extortion to force suppliers of industrial grinders and vacuum systems, including Contec, Ermator, and

26

Pullman, to stop selling their products to Innovatech. [Doc. 20 ¶ 404-05.] Innovatech alleges that third-party defendants engaged in this conduct to eliminate Innovatech as a competitor. [Doc. 20 ¶¶ 404-05.] Accordingly, Innovatech has sufficiently stated a claim for a violation of § 2 of the Sherman Act against third-party defendants.

### 3.      Clayton Act § 3

To state a claim under § 3 of the Clayton Act, 15 U.S.C. § 14, the plaintiff must allege that (1) the defendant made a sale on the condition that the buyer not use or deal in goods of the defendant's competitors, (2) that the contract substantially lessened the competition or tended to create a monopoly in the relevant market, and (3) that the plaintiff was injured in its business or property as a result of defendant's actions. *Tampa Elec. Co. v. Nashville Coal Co.*, 276 F.2d 766, 777, 778 (6th Cir. 1960), *overruled on other grounds by* 365 U.S. 320 (1961). This section of the Clayton Act was designed to prevent a seller from conditioning the sale of products to a buyer on the buyer's agreement not to buy the products of one of the seller's competitors through tying agreements or exclusive dealing agreements. *See McElhenney Co. v. Western Auto Supply Co.*, 269 F.2d 332, 338 (4th Cir. 1959).

Innovatech alleges that third-party defendants conspired with HTC to condition HTC's business with its suppliers on the suppliers' agreement not to sell products to Innovatech. Innovatech alleges that it was a competitor of HTC in the United States market and that HTC wanted to force Innovatech out of that market. Innovatech alleges that HTC attempted to do so by using its economic power and threats to force suppliers of industrial

surface preparation equipment to stop selling to Innovatech. Innovatech alleges that it has been injured by this conduct and actual damages will be established at trial.

If third-party defendants and HTC conditioned the sale of HTC's products on the suppliers' agreement not to *buy* Innovatech products, it is clear that such activity would violate § 3 of the Clayon Act. The Court does not find that the difference between prohibiting the purchase of a product from a competitor and prohibiting the sale of a product for resale to a competitor is material. Both scenarios condition the sale of a product on the restraint of trade with a competitor. Thus, the Court finds that Innovatech has sufficiently alleged a violation of § 3 of the Clayton Act.

Accordingly, the Court will not dismiss Innovatech's claims against third-party defendants for restraint of trade under the Sherman Act, 15 U.S.C. §§ 1-3, the Wilson Tariff Act, 15 U.S.C. § 8, and Clayton Act, 15 U.S.C. § 14.

### H.    Third-Party Claim II: Acquisition Tending to Create Monopoly

Innovatech alleges that Thysell and Abrahamson engaged in activity that substantially lessened competition and tended to create a monopoly in violation of § 7 of the Clayton Act, 15 U.S.C. § 18. To properly allege a violation of § 7 of the Clayton Act, a party must claim that (1) a person or entity; (2) engages in commerce or an activity affecting commerce; (3) merges with another person also engaged in commerce, and (4) the effect of the merger is to substantially lessen competition or tend to create a monopoly. 15 U.S.C. § 18; *see also Transamerica Corp. v. Bd. of Governors of Fed. Reserve Sys.*, 206 F.2d 163, 170 (3d Cir. 1953). Section 7 of the Clayton Act does not prevent a corporation from forming a

subsidiary to carry on its immediate lawful business unless the formation substantially lessens competition. 15 U.S.C. § 18.

A claim for an antitrust violation requires a showing that the defendant's conduct had an adverse effect on market-wide competition, not just an individual competitor. *Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 346 (6th Cir. 2006) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1997) ("The antitrust laws . . . were enacted for the protection of competition, not competitors."); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 244 (2d Cir. 1997). To survive a motion to dismiss, there must be an allegation that the defendant's action substantially lessened the competition or tended to create a monopoly in the relevant market. *See Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 982 (1977).

Innovatech alleges that Thysell and Abrahamson terminated Innovatech and VIC International as HTC Sweden's distributors in the United States, conspired to and did establish HTC, Inc. as the sole distributor of HTC Sweden's products in the United States, then acquired all of the capital stock and assets of HTC, Inc. for their own financial benefit. [Doc. 20 ¶¶ 411-12.] Innovatech alleges that the purpose of Thysell and Abrahamson's actions "was to substantially lessen competition in the United States or tend to create a monopoly in the market for industrial floor grinding machines, vacuum systems, diamond tooling used with such machines and in the market for spare parts and replacement parts needed to provide necessary maintenance services, repairs, and warranty repairs." [Doc. 20 ¶ 412.] Innovatech also alleges that HTC used its economic power and threats to keep other

29

suppliers from selling their industrial floor resurfacing equipment to Innovatech in an effort

to force Innovatech out of the market. [Doc. 20 ¶ 404-05.] Thus, Innovatech alleges facts to

support a violation of § 7 of the Clayton Act and, therefore, the Court will not dismiss Third-

Party Claim II.

## I.      Third-Party Claim III: Restraint of Trade in Repair Services

Third-party defendants move for dismissal of this claim on the grounds that a

corporate parent cannot conspire with its own subsidiaries or individual employees,

Innovatech did not allege an adverse effect on market-wide competition, Innovatech does not

have standing to pursue an antitrust claim, and Innovatech did not allege market power. The

Court relies on its previous discussion of conspiracy and market power in Part III.G.2 of this

opinion and antitrust standing in Part III.E.2 of this opinion. The Court notes that third-party

defendants' market-wide competition argument applies to § 7 of the Clayton Act, 15 U.S.C.

§ 18. Innovatech only alleges violations of the Sherman Act, §§ 1,2 in this claim and

therefore, the Court need not address this argument. Accordingly, Third-Party Claim III will

not be dismissed.

## J.      Third-Party Claim IV: Interference with Commerce by Threats

Innovatech consents to the dismissal of this claim without prejudice of its right to

assert the averments therein in support of its third-party claims fro RICO violations and other

claims and counterclaims. Therefore, Third-Party Claim IV will be dismissed.

30

### K.     Third-Party Claim V: Pattern of Racketeering Activity

Innovatech does not allege any other predicate acts upon which this RICO claim is based other than those previously discussed in Part III.F of this opinion. Because the Court already determined that HTC's alleged threats to discontinue business with Innovatech's suppliers and threats of litigation do not constitute extortion under the Hobbs Act, and Innovatech does not allege any other predicate acts, Third-Party Claim V will be dismissed.

### L.     Personal Jurisdiction Regarding Thysell and Jeansson

The third-party defendants argue that Innovatech's claims against Thysell and Jeansson must be dismissed because the Court does not have personal jurisdiction over them. The Sixth Circuit has made clear that the officer of a corporation is not shielded from personal jurisdiction simply because he was acting in his official capacity. *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 698 (6th Cir. 2000). However, jurisdiction over the corporation does not automatically confer jurisdiction over an individual officer or agent. *Id.* "[W]here an out-of-state agent is actively and personally involved in the conduct giving rise to the claim, the exercise of personal jurisdiction should depend on traditional notions of fair play and substantial justice; i.e., whether she purposely availed herself of the forum and the reasonably foreseeable consequences of that availment." *Id.*

A defendant is considered to have been personally and actively involved in a corporation's conduct when he directed the actions of a corporation in the forum state. *Id.* at 698. Thysell is a director and majority owner and Jeansson is a managing director of HTC Sweden, the parent company of Tennessee-based HTC, Inc. [Doc. 20 ¶¶ 393, 395, 396.]

Innovatech alleges that Thysell and Jeansson have "authorized, ordered, controlled or done the acts of HTC [Sweden] and HTC, Inc." that are the subject of the third-party complaint. [Id. at ¶ 398.] The Court finds that these contacts are sufficient to show that Thysell and Jeansson were personally and actively involved in conduct in the forum state.

Having found that Thysell and Jeansson were personally and actively involved, the Court must now determine whether exercising personal jurisdiction would violate the requirements of the Due Process Clause. *Id.* The Sixth Circuit has articulated a three-part test for making this determination:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).

Addressing the first prong of the *Mohasco* test, the Court must consider whether the third-party defendants' contacts with the forum state "proximately result from actions by the [third-party] defendant *himself* that create a 'substantial connection' with the forum State," and whether the third-party defendants "should reasonably anticipate being haled into court there." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996) (emphasis in original). Both Thysell and Jeansson themselves controlled actions of HTC, a Tennessee corporation, within the state. Controlling the operation of a local business constitutes a substantial connection with the forum state.

32

Turning to the second prong of the *Mohasco* test, the cause of action is deemed to arise from defendant's activities in the forum state "[i]f a defendant's contacts with the forum state are related to the operative facts of the controversy." *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002) (quoting *CompuServe, Inc.*, 89 F.3d at 1263). Here, Innovatech alleges that, in Tennessee, Thysell and Jeansson authorized, ordered, or controlled actions, which constitute the operative facts of the controversy. Taking this allegation as true, the Court finds that the second prong of the *Mohasco* test is met.

Factors to consider in addressing the reasonableness prong of the *Mohasco* test include "the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states in securing the most efficient resolution of controversies." *Bird*, 289 F.3d at 875 (quoting *CompuServe, Inc.*, 89 F.3d at 1268). The state of Tennessee has an interest in enuring that all business conducted within its borders is fair and just, and accordingly has a significant interest in this litigation. The burden on Thysell and Jeansson of defending themselves in Tennessee, though they live outside of the United States, is not great as they would likely be called to testify at HTC's trial on HTC's behalf even if they were not named as defendants. Innovatech's interest in obtaining relief is great because this might be the most likely forum in which Innovatech can get personal jurisdiction over Thysell and Jeansson. The Court is not aware of any related litigation pending in another state and, thus, there is no concern of lack of efficiency by trying these third-party defendants in Tennessee.

Having found that Thysell and Jeansson participated personally and actively in HTC conduct within the forum state and that exercising personal jurisdiction over these defendants would not offend the Due Process Clause, the Court will not dismiss the claims against Thysell and Jeansson for lack of personal jurisdiction.

## IV.    Conclusion

For the reasons set forth herein, Plaintiff's Motion to Dismiss Counterclaims I-VII and IX-X of Defendant's First Amended Answer, Affirmative Defenses, Counterclaims and Third-Party Claims [Doc. 21] and Third-Party Defendants' Motion to Dismiss Defendant Innovatech's Third-Party Complaint [Doc. 25] are hereby **GRANTED in part** and **DENIED in part**, and defendant's Counterclaims VII and X and defendant's Claims IV, and V against the third-party defendants shall be **DISMISSED with prejudice**.

IT IS SO ORDERED.


s/ Thomas A. Varlan                            
UNITED STATES DISTRICT JUDGE